UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LUCIA BRAVO,

    Plaintiff,

v.                                              Case No. 8:21-cv-00887-TPB-SPF

IQ DATA INTERNATIONAL, INC., *et al.*

    Defendants.

_____/

## REPORT AND RECOMMENDATION

Following the dismissal of Plaintiff Lucia Bravo's ("Bravo") lawsuit for lack of prosecution due to her failure to comply with Court orders and attend scheduled hearings (Doc. 72), Defendant IQ Data International, Inc. ("IQ Data") moved for entitlement to attorney's fees and costs against Bravo and her former counsel, Jon Dubbeld ("Attorney Dubbeld") (Doc. 73). Although Bravo, now proceeding *pro se*, did not formally respond to the motion, the Court will construe her May 4, 2022 letter detailing "her side of the story" (Doc. 96) as a response to IQ Data's motion. Also before the Court are Attorney Dubbeld's opposition to IQ Data's motion (Doc. 77), and IQ Data's reply thereto (Doc. 80). On May 18, 2022, the Court held an evidentiary hearing at which Bravo and Attorney Dubbeld testified. After considering the evidence and arguments presented to the Court, the undersigned recommends that IQ Data's motion be GRANTED as to Bravo and DENIED as to Attorney Dubbeld.

    **I.**     **FINDINGS OF FACT**

In early 2018, Bravo authorized her friend, Helen Rosario ("Rosario"), in series of text messages, to "apply online" for what was later shown to be an apartment (Doc. 73-22). Bravo

sent Rosario her full name, address, and Social Security Number (*Id.*). Rosario responded by stating she is "going to list myself as your emergency contact [a]nd my kids are going to be your kids lol [o]n the lease" (*Id.*). Bravo agreed by stating, "Ok" (*Id.*). Bravo then texted her date of birth and asked Rosario to please delete it after using it (*Id.*). Bravo informed Rosario that while her credit is "not that great" she still did not want her personal information getting around. Rosario responded by stating, "I thought your credit was ok" (*Id.*). To which Bravo responded, "OMG try it" (*Id.*). Rosario later informed Bravo that the lease had been "approved" and notified Bravo that "[w]e have to turn in money on the 1st so maybe tomorrow we can get together [so] I can give u what u need and then money to pay the apartment" (*Id.*). On February 2, 2018, Rosario texted Bravo that "hopefully we can go sign the lease when you get off [work]" (*Id.*). Bravo responded: "Wow it's been a month to do this it even seems unreal[.] Anyway[,] I can meet you at 6ish" (*Id.*).

After Rosario moved into the apartment, Bravo visited her there (Doc. 57-1 at 77). Rosario lived in the apartment from February 2018 until approximately June 2018 (Doc. 73-26 at 21:2-7) and was evicted for unpaid rent on August 28, 2018 (Doc. 1-6). The lease, however, extended until February 28, 2019 (Doc. 1-6). The unpaid rent and other fees were eventually sent to IQ Data for collection (*Id.*).

On July 24, 2019, IQ Data called Bravo regarding the debt (Doc. 86-2). Bravo refused to pay and hung up (*Id.*). According to Rosario, Bravo then reached out to tell her that IQ Data was "collecting on her" (Doc. 73-26). Rosario told Bravo that she would call IQ Data and make some type of payment arrangement (*Id.*). Bravo then gave Rosario the phone number for IQ Data (*Id.*). Bravo admits that she reached out to Rosario after the call from

2

IQ Data (Doc. 96).  According to Bravo, Rosario claimed she was never evicted and advised Bravo to tell IQ Data that it was not Bravo's debt (*Id.*).

Eleven minutes after the initial call to Bravo, Rosario called IQ Data from a different number and pretended to be Bravo (Doc. 86-2).  While on hold, the call with Rosario was disconnected.  One minute later, Rosario called back a second time, again pretending to be Bravo (*Id.*).  During the recorded call, Rosario admitted that she moved out of the apartment in August 2018[1] (Doc. 82-1).  After Rosario rejected IQ Data's settlement offer and threatened to hire an attorney, the call ended (*Id.*).  A few days later, on August 2, 2019, Bravo disputed the reporting of the IQ Data debt with Experian Information Solutions, Inc., TransUnion, and Equifax Information Solutions, Inc. (Doc. 34).

On December 11, 2019, IQ Data sent Bravo a verification letter stating that the debt was valid and requested that Bravo "remit the balance in full of $12689.36" (Doc. 1-6).  Rosario later met Bravo for coffee in 2020 (Doc. 73-26 at 10).  During this meeting, Bravo told Rosario that she was being sued for the unpaid rent (*Id.*).  In response, Rosario said she "tried to apologize" (*Id.*).

On January 7, 2021, Attorney Dubbeld, on behalf of Bravo, sent IQ Data and others a letter disputing the debt (Doc. 1-7).  IQ Data's January 20, 2021 letter in response stated that Bravo had "claimed that this account is the result of fraud or identity theft and therefore we ask [Bravo] to provide certain information to assist us with investigation of your claim" (Doc. 35-1).  The information requested included: (1) a copy of a police report or notarized affidavit; (2) a copy of Bravo's driver's license; and (3) proof of residency at the time of the alleged fraud or identity theft (Doc. 35-1).  On March 1, 2021, Attorney Dubbeld provided

---

[1] As stated above, Rosario testified during her deposition that she moved out in June 2018.

IQ Data a copy of Bravo's driver's license and a letter form the Preserve at Alafia, where Bravo lived from October 20, 2017 to May 11, 2020 (Doc. 1-11).

Thereafter, on April 12, 2021, Bravo filed this action against Defendants IQ Data, Experian Information Solutions, Inc., TransUnion, and Equifax Information Solutions, Inc. for violating the Florida Consumer Collection Practices Act ("FCCPA") and the federal Fair Credit Reporting Act ("FCRA") by using unfair debt collection and reporting practices regarding unpaid apartment rent (Doc. 1). The Complaint alleges that "***[Bravo] did not open the Account, [Bravo] did not authorize any individual or entity to open the Account in her name***, [Bravo] did not use the Account in any manner, and [Bravo] did not receive the benefit of any good or services as a result of any transactions made creating the Alleged Debt" (*Id*. at ¶28) (emphasis added). Bravo also alleged that "she [did] not know any of these other people listed on the contract" *i.e.,* Rosario's children (*Id.* at ¶38). In her verified Answers to Court Interrogatories, Bravo attested that she "first learned that an apartment lease account was allegedly opened in [her] name in July 2019" (Doc. 34).[2]

During the course of the litigation, IQ Data made settlement offers to Bravo through Attorney Dubbeld. Attorney Dubbeld testified that he or his secretary presented all settlement offers to Bravo by telephone, in writing via email, or by text message. Attorney Dubbeld submitted text messages showing he relayed IQ Data's offers of $2,500 to Bravo on May 5, 2022; $3,500 on May 6, 2022; $4,500 on May 10, 2022; $5,250 in the morning on May 14, 2022; and $6,000 in the afternoon on May 14, 2022 (Doc. 89, ex. 1-6). Then, in a text message

---

[2] At her October 2021 deposition, Bravo testified that it was in September or October 2020 that she first learned that her credit reports listed an outstanding eviction based upon a default of an apartment lease opened in her name but without her consent (Doc 57-1 at 15, 74).

4

dated May 14, Attorney Dubbeld asked Bravo for "authority to negotiate up to 20k. Meaning I won't go under 20k. This way, I can see what their top number is. I won't accept anything unless you approve" (Doc. 89, ex. 6). Bravo responded "With IQ? OK" (*Id.*). Although Bravo testified that Attorney Dubbeld did not convey to her IQ Data's May 17 offers of $6,750 and $7,500, or its May 18 offer of $8,000, Attorney Dubbeld explained that these last three offers were relayed to Bravo via telephone calls.

On July 8, 2021, counsel for IQ Data sent Attorney Dubbeld recordings of the previously referenced July 24, 2019 telephone conversations where IQ called Bravo and then eleven minutes later Rosario returned the call pretending to be Bravo (Doc. 73-15). Upon receiving the recording, Attorney Dubbeld called Rosario to investigate (Doc. 73-26). Rosario told Attorney Dubbeld that Bravo was her friend at the time of lease (*Id.*). Rosario claimed her "credit was shot," so she asked Bravo to help get her an apartment (*Id.*). When Attorney Dubbeld told Rosario that Bravo denied knowing her, Rosario responded that Bravo "knows who I am, she knows my children. We were friends" (*Id.*). Attorney Dubbeld told Rosario that he was very upset because Bravo told him that her identity was stolen (*Id.*). Rosario told Attorney Dubbeld that there was no way Bravo could have forgotten about the arrangement because she spoke with Bravo about it in 2020 (*Id.*). Rosario, however, did not tell Attorney Dubbeld that she used Bravo's identity and information to sign the lease because Bravo was "the one who actually signed it" (*Id.*).

When confronted with the telephone recording, Bravo told Attorney Dubbeld that she recognized Rosario's voice (Doc. 93). Bravo, however, denied signing the lease or authorizing Rosario to use her personal information (*Id.*). According to Bravo, Attorney Dubbeld asked her several different ways whether she signed the lease and whether she gave

5

anyone permission to use her identity (*Id.*).  In response to these questions, Bravo answered: "No" (*Id.*).

On August 18, 2021, IQ Data came into possession of the 2018 text messages between Bravo and Rosario (Doc. 73-21) and presented them to Attorney Dubbeld the following day.  Bravo testified she had no recollection of allowing Rosario to use her identity until August 2021, when Attorney Dubbeld showed her the above-described text messages (Doc 57-1 at 23).  Bravo explained:

> So back in 2017/2018 I was going through a divorce.  So I was moving out.  I was doing this whole thing and I just wasn't – you know I was just going through a lot during this time.  So I didn't recall me ever doing anything. This is like three, four years ago.  I couldn't remember until those texts were sent to me that the lawyer sent to me that I recall any of it. I really did not remember me doing anything.  I found out about the eviction because I tried to go buy a house and I couldn't rent anywhere.  So by then, I wasn't talking to [Rosario] and I really didn't even think about her in any way or form.  So I just went ahead, I tried to fix it and this is what I was doing because I did not recall me doing this – this lease that I did.  Because by then I was – like I said, I was going through a divorce. I was going through this whole thing and I just had signed the lease where I was living.  So I wasn't really thinking about—what do you say Azola, Magnolia, whatever that place is.  So I wasn't never thinking about that until, you know, recently when all this exploded with this text that I agree on something.  I really did not remember. I'm honestly saying that I did not remember until that happened. … And I vaguely still remember.

(Doc. 57-1 at 14-15).  Bravo candidly admitted that upon reviewing the text messages "it seems [my identity] wasn't stolen (Doc. 57-1 at 65, 75).

After discussing these text messages with Bravo, on August 27, 2021, Attorney Dubbeld filed his emergency motion to withdraw as Bravo's counsel pursuant to Fla. R. Prof. Conduct 4-1.16(a), advising the Court that he "was presented with new evidence that contradicts the allegations presented in this case to date" (Doc. 42).  Following Attorney Dubbeld's withdrawal, IQ Data requested that the Court allow it to conduct discovery to support its forthcoming motion for attorney's fees and costs (Doc. 48).  After allowing time

for such discovery, on February 6, 2022, the district judge dismissed Bravo's case due to her "failure to comply with court orders and failure to attend scheduled hearings" and directed IQ Data that it may file a motion for sanctions and/or attorney's fees and costs (Doc. 72).

## II.   DISCUSSION

By its motion, IQ Data seeks an award of attorney's fees and costs against Attorney Dubbeld pursuant to 28 U.S.C. §1927, the Court's inherent power, and Fed. R. Civ. P. 11; and against Bravo pursuant to the FCRA, 15 U.S.C. § 1681n(c) and § 11681o(b), the FCCPA, Fla. Stat. § 559.77(2), and the Court's inherent authority.

### A.   Plaintiff Lucia Bravo

IQ Data asserts that Bravo acted in bad faith by filing this action that alleges her identity was stolen and the debt at issue was not hers. Relying upon the July 2019 recorded telephone conversations, IQ Data questions the integrity of Bravo's claim that at the time she filed this action she "had forgotten" that she allowed Rosario to use her identity. IQ Data asserts Bravo's conduct justifies an award of court costs and attorney's fees pursuant to Fla. Stat. §559.77(2) of the FCCPA, 15 U.S.C. §§ 1681n(c) and 1681o(b) of the FCRA, and/or this Court's inherent power.

#### 1.   FCRA

Section 1681n of the FCRA, governing civil liability for *willful* noncompliance, and 15 U.S.C. § 1681o of the FCRA, governing civil liability for *negligent* noncompliance, provide that "[up]on a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper." 15 U.S.C. §

1681n(c); 15 U.S.C. § 1681o(b).  While "bad faith" is not defined under the FCRA, "as ordinarily used in the attorney's fee context, [the term] requires a showing either that the party subjectively acted in bad faith—knowing that he had no viable claim—or that he filed an action or paper that was frivolous, unreasonable, or without foundation." *Clemons v. Cutler Ridge Automotive, LLC*, No. 6-21648-CIV-KING/BANDSTRA, 2008 WL 11409007, at *4 (S.D. Fla. June 24, 2008) (citing *Ryan v. Tran Union Corp.*, No. 99C216, 2001 WL 185182, at *5-6 (N.D. Ill. Feb. 26, 2001)).

While Bravo contends that she did not remember giving Rosario her personal information to obtain an apartment until Attorney Dubbeld showed her the texts messages in August 2020, the Court does not find this explanation credible.  Rather, substantial evidence shows that Bravo authorized Rosario to use her personal information to obtain the lease.  Not only did Bravo give Rosario her information and encourage her to "try it," she explicitly discussed going with Rosario to the leasing office to sign the lease.  Moreover, Bravo admitted to visiting Rosario after she moved into the apartment.  And when IQ Data attempted to collect the unpaid rent from Bravo, she immediately contacted Rosario, who called IQ Data 11 minutes later.  When Rosario could not reach a settlement with IQ Data, Rosario told Bravo to tell IQ Data that the debt was not hers (Bravo's), which Bravo thought was true because it was Rosario's debt (Doc. 96).  But Bravo authorized Rosario to use her information to obtain the lease.  Bravo alleged in the Complaint that she "did not open the Account, [and] did not authorize any individual or entity to open the Account in her name" (Doc. 1 at ¶28).  This allegation was patently false, and Bravo knew it when she instructed Attorney Dubbeld to file the Complaint.  As a result, this Court concludes that Bravo acted willfully and in bad faith by filing an action that lacked a plausible legal basis.

### 2. FCCPA

Pursuant to Fla. Stat. § 559.77(2) of the FCCPA, if the court finds that the suit fails to raise a justiciable issue of law or fact, the plaintiff is liable for court costs and reasonable attorney's fees incurred by the defendant. "[W]hile there is relatively little authority explaining what constitutes a failure 'to raise a justiciable issue of law or fact' under § 559.77(2), courts that have addressed the issue have equated non-justiciability with frivolousness." *Medley v. Dish Network LLC*, No. 8:16-cv-25340-T-36CPT, 2020 WL 7646966, at *2 (M.D. Fla. Dec. 7, 2020) (numerous Florida court citations omitted), *report and recommendation adopted*, 2020 WL 7640732 (M.D. Fla. Dec. 23, 2020); *Conner v. BCC Fin. Mgmt. Servs., Inc.*, 597 F.Supp 2d 1299, 1302 (S.D. Fla. 2008) (quoting *JES Properties, Inc. v. USA Equestrian, Inc.*, 432 F.Supp. 2d 1283, 1290 (M.D. Fla. 2006)).

Upon consideration, and for the reasons discussed above with regard to the FCRA, the undersigned finds that the facts before the Court show that Bravo's FCCPA claims fail to raise justiciable issues of law or fact. Bravo's claim was both fraudulent and frivolous. Accordingly, this Court respectfully recommends that Plaintiff be held liable for IQ Data's attorney's fees under Fla. Stat. § 559.77(2).

### B. Attorney Dubbeld

IQ Data claims Attorney Dubbeld should be responsible for IQ Data's attorney's fees and costs pursuant to 28 U.S.C. § 1927, Rule 11, or the Court's inherent power because he failed to abide by Bravo's settlement instructions; failed to communicate IQ Data's settlement offers to Bravo; and continued to litigate this case after July 8, 2021, when IQ Data claimed

it became "objectively obvious that the case was a total fraud." (Doc. 73, p.14).[3] A sanctions award under either 28 U.S.C. § 1927 or the Court's inherent power requires a showing that the violating party acted in bad faith. *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020). Section 1927 provides that an attorney "who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Eleventh Circuit interprets the statute as imposing three essential requirements:

> First, the attorney must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings." Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, *i.e.*, the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

*Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997)). Under § 1927, "the party moving for sanctions must show *objective* bad faith." *Hyde*, 962 F.3d at 1310 (emphasis in original). In the Eleventh Circuit, this means showing that an attorney acted "knowingly or recklessly." *Id*. (quoting *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003)). This is a "high standard" that requires the moving party to show that the other side's behavior "grossly deviate[d] from reasonable conduct." *Amlong*, 500 F.3d at 1240, 1242. An attorney must

---

[3] IQ Data suggests in summary fashion that this Court award attorney's fees and costs under Rule 11 "for the same reasons discussed regarding §1927" (Doc. 73, n.14). IQ Data did not serve a safe-harbor notice with a draft motion for sanctions per Rule 11(c)(2), and the Court has not issued a show-cause order per Rule 11(c)(5)(B). *See Cap. Corp. Merch. Banking, Inc. v. Norwich*, No. 6:07-cv-1626-Orl-35KRS, 2009 WL 10671309, at *2 (M.D. Fla. June 2, 2009) ("Counsel for movant did not assert or present evidence that it served the motion twenty-one days before it was filed. As such, the motion is due to be denied on that basis alone."), *report & recommendation adopted*, No. 6:07-cv-1626-Orl-35KRS, Doc. 97 (M.D. Fla. June 23, 2009). Accordingly, IQ Data has not established entitlement to sanctions under Rule 11.

"knowingly or recklessly pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim." *Id*. at 1242. Section 1927 does not apply to parties. Sanctions under § 1927 are discretionary, and the court, for equitable reasons, may decline to impose them. *Olson v. Reynolds*, 484 F. App'x 61, 64-65 (7th Cir. 2012).

Similarly, a court may impose sanctions for litigation misconduct under its inherent power. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). "In the context of inherent powers, the party moving for sanctions must show *subjective* bad faith." *Miller*, 2021 WL 4240972, at * 2 (emphasis in original). This standard can be met either (1) with direct evidence of the attorney's subjective bad faith or (2) with evidence of conduct "'so egregious that it could only be committed in bad faith.'" *Id*. (quoting *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224-25 (11th Cir. 2017)). "The high standard of finding bad faith cannot be met in the absence of fraud on the Court, proof of forum shopping, unreasonable and vexatious multiplying of proceedings, pursuing a case barred by the statute of limitations, or purposely vexatious behavior[.]" *Absolute Activist Value Master Fund v. Devine*, No. 2:15-cv-328-FtM-29MRM, 2019 WL 3491962, at * 11 (M.D. Fla. Aug. 1, 2019), *affirmed* 826 F. App'x 876 (11th Cir. 2020). For the reasons set forth below, the Court finds that Attorney Dubbeld did not act in bad faith.

        **1.**    **Settlement instructions and communication of offers**

IQ Data claims that by failing to communicate settlement offers to Bravo and failing to abide by Bravo's settlement instructions, Attorney Dubbeld prolonged the litigation and caused IQ Data to spend approximately $42,000 in attorney's fees. While Bravo did not recall being informed of all settlement offers, her testimony lacked credibility and the Court finds her recollection cannot be trusted. The Court is more convinced by Attorney Dubbeld's

testimony and his text messages with Bravo which support his representation that *all* settlement offers were presented to Bravo by either telephone, in writing via email, or by text message.

Upon consideration, the Court is satisfied that Attorney Dubbeld acted reasonably and ethically in communicating settlement offers to Bravo and in abiding by Bravo's settlement instructions. Attorney Dubbeld stated under oath that he communicated all settlement offers to his client. Accordingly, the undersigned concludes that IQ Data has not shown, with regard settlement negotiations, that Attorney Dubbeld "grossly deviate[d] from reasonable conduct," or "knowingly or recklessly pursue[d] a frivolous claim or needlessly obstruct[ed] the litigation of a non-frivolous claim." *See Amlong*, 500 F.3d at 1240, 1242.

### 2. Litigation after July 8

IQ Data also seeks sanctions based upon Attorney Dubbeld's failure to withdraw as counsel before August 27, 2021. To this end, IQ Data contends that "on July 8, 2021, it was crystal clear that this case was a fraud" (Doc. 73 at 21). On July 8, 2021, IQ Data sent all attorneys the recorded telephone conversations between IQ Data and Bravo and IQ Data and Rosario, who was pretending to be Bravo. IQ Data further maintains that also on July 8, 2021, "[Attorney] Dubbeld had a conversation with Rosario where Rosario told [Attorney] Dubbeld the entire plot and that Bravo was lying to him" (*Id.*). IQ Data contends that "pursuant to those conversations alone, it was obvious that the debt at issue was valid and that Rosario and Bravo had worked together to create this fraud" (*Id.*).

While Rosario told Attorney Dubbeld that Bravo allowed her to use her name, information, and financial data, thus calling into question the allegations in Bravo's Complaint (that her identity was stolen and that the debt for unpaid apartment rent was not

12

her debt), Bravo disputed these contentions (Docs. 61; 61-16; 65). At the evidentiary hearing, Bravo testified that when Attorney Dubbeld asked her to listen to IQ Data's recorded call, Bravo told Attorney Dubbeld that she recognized the caller as Rosario (Docs. 93-94). Bravo recollected that Attorney Dubbeld asked her in "different ways" whether she signed a lease for Rosario and whether she had authorized Rosario to use her identity (*Id.*). Bravo told Attorney Dubbeld that she had not (*Id.*). Similarly, Bravo admits in "her side of the story," that she spoke with Attorney Dubbeld about the above-described recorded call from Rosario, that Attorney Dubbeld was "upset telling me I called IQ to settle and I told him that wasn't me but I did recognize the voice which was Helen Rosario." (Doc. 96). At that time, "[Attorney Dubbeld] asked if I had signed a lease for her and I said no because I was certain that I did not." (*Id.*).

It was not until a month and a half later, on August 19, 2021, that Attorney Dubbeld first learned that his client acknowledged the falsity of the allegations in her Complaint. On this date, Attorney Dubbeld received an email from Trans Union's counsel attaching copies of text messages between Bravo and Rosario (Doc. 65, ¶6). As Attorney Dubbeld's counsel represented to the Court:

> At that time [Swift Law] became aware of the phone calls that, again, created material issues of fact, again, a he said/she said, for lack of a better term. It was never confirmed with any affirmative communication from our client. Not to us. … This was the first indication of our client making an affirmative acknowledgment that she had given permission, for lack of a better term, or consent, at that point we immediately had for the very first time that evidence, discussed with our former client, and then immediately withdrew.

(Doc. 77-1, p.19, lines 1-3, 8-19). The evidence presented to the Court supports this contention. Accordingly, the Court finds that August 19, 2021, marks the first time Attorney

13

Dubbeld learned of any Bravo-authored communications directly contradicting the allegations in the Complaint.

The Court concludes that Attorney Dubbeld's actions and his emergency motion to withdraw as counsel for Bravo on August 27, 2021 (Doc. 45), filed eight days after he first learned of the Bravo-authored communications that directly contradicted his client's allegations, do not constitute "gross deviations" from "reasonable conduct." *See Amlong*, 500 F.3d at 1240, 1242. The Court further finds that IQ Data, as the moving party, has not shown that Attorney Dubbeld "grossly deviate[d] from reasonable conduct," or "knowingly or recklessly pursue[d] a frivolous claim or needlessly obstruct[ed] the litigation of a non-frivolous claim." *Id*. As a result, sanctions are not warranted against Attorney Dubbeld (or the Swift law firm) because IQ Data has not demonstrated bad faith under either the Court's inherent power or § 1927.

### III.    Conclusion

Accordingly, it is RECOMMENDED:

1. Defendant IQ Data's Motion for Entitlement to Attorney's Fees and Costs (Doc. 73) be GRANTED as to Plaintiff Lucia Bravo, and DENIED as to Attorney John P. Dubbeld;

2. Attorney Dubbeld's request for an award of reasonable expenses, including attorney's fees, incurred in defending the motion pursuant to Fed. R. Civ. P. 11(c)(2) be DENIED; and

3. Within 45 days of the Court's order adopting this Report and Recommendation, IQ Data be directed to supplement is motion regarding the amount of reasonable

attorney's fees it expended responding to Plaintiff's Complaint. L.R. 7.01(c). M.D.Fla.

**IT IS REPORTED** in Tampa, Florida, on August 9, 2022.

_____
SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to the proposed findings and recommendations or request an extension of time to do so. 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1. Failure of any party to timely object under § 636(b)(1) waives that party's right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions in this Report and Recommendation. 11th Cir. R. 3-1.